The Honorable Mary Alice Theiler

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO.  MJ20-253 |
| Plaintiff, | COMPLAINT FOR VIOLATIONS |
| v. | Title 18, United States Code, Sections 922(g)(1) |
| LEO MYRON DICKERSON, | |
| Defendant. | |

Before the Honorable Mary Alice Theiler, United States Magistrate Judge, United States Courthouse, Seattle, Washington.

The undersigned complainant, Andriy Vavilin, Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being duly sworn states:

## COUNT ONE

### (Felon in Possession of a Firearm)

On or about May 20, 2019, in Seattle and elsewhere within the Western District of Washington, LEO MYRON DICKERSON, knowing he had been convicted of a crime punishable by imprisonment for a term exceeding one year, that is:

> *Unlawful Possession of a Firearm*, under cause number 18-CR-226-RSL, in United States District Court for the Western District of Washington, on or about February 22, 2019;

did knowingly possess a firearm, namely: a Glock 22, .40 caliber pistol, which had been

shipped and transported in interstate and foreign commerce.

All in violation of Title 18, United States Code, Section 922(g)(1).

## COUNT TWO

### (Felon in Possession of a Firearm)

On or about February 14, 2020, in Puyallup and elsewhere within the Western

District of Washington, LEO MYRON DICKERSON, knowing he had been convicted of

a crime punishable by imprisonment for a term exceeding one year, that is:

> *Unlawful Possession of a Firearm*, under cause number 18-CR-226-RSL,
> in United States District Court for the Western District of Washington, on
> or about February 22, 2019;

did knowingly possess a firearm, namely: a Smith & Wesson SD40, .40 caliber pistol,

which had been shipped and transported in interstate and foreign commerce.

All in violation of Title 18, United States Code, Section 922(g)(1).

## INTRODUCTION

1.      I, Andriy I. Vavilin, being duly sworn, depose and state, that I am a Special

Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), United

States Department of Justice, and have been so employed since July of 2017.  I am a law

enforcement officer of the United States, and am empowered by law to conduct

investigations of, and to make arrests for, offenses against the United States, as codified

at Title 18, United States Code, Section 3051.  I have completed the Federal Law

Enforcement Training Center Criminal Investigative Program and the ATF National

Academy Special Agent Basic Training Program in Brunswick, Georgia.  Prior to

becoming an ATF Special Agent, I graduated from Rowan University and received a

Bachelor's of Arts Degree in Law & Justice (Summa Cum Laude).  From 2014 to 2017, I

was employed as a Police Officer with the United States Capitol Police.

2.      During my professional training and experience, I have both assisted in and

conducted investigations into firearms and narcotic violations.  I have also participated in

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

undercover operations, and in the execution of search warrants at locations associated with these individuals.  During the execution of search warrants, I have participated in the recovery of evidence related to firearms and narcotic violations.  Through this experience and training, and based upon the experience of other Special Agents which have been relayed to me, I have become familiar with the modus operandi of narcotic dealers and narcotic traffickers and illegal possessors of firearms and ammunition as enumerated herein.

3.     I have been involved in an investigation, which is the subject of this Affidavit.  Due to my personal participation in this investigation and reports made to me by other Special Agents and other Law Enforcement Officers, I am familiar with the facts and circumstances surrounding the investigation.  My training and experience as a Special Agent, including participation in this investigation, form the basis for the opinions and conclusions set forth below.

4.     Since I am submitting this affidavit for the limited purpose of establishing probable cause, however, I have not included each fact known to me concerning this investigation.

## SUMMARY OF INVESTIGATION

5.     I have reviewed DICKERSON's criminal history and observed he has at least one conviction punishable by imprisonment for a term exceeding one year, which would federally prohibit him from possessing firearms, specifically: *Unlawful Possession of a Firearm*, under cause number 18-CR-226-RSL, in United States District Court for the Western District of Washington, dated on or about February 22, 2019.

6.     When DICKERSON pleaded guilty, he acknowledged that this crime carries a maximum penalty of up to 10 years' imprisonment.

7.     DICKERSON is currently on federal supervised release in 18-CR-226-RSL.

COMPLAINT / LEO DICKERSON - 3

8.      DICKERSON has also previously been convicted of the following felony crime in King County Superior Court: *Unlawful Possession of a Firearm*, under cause number 18-1-00373-0, dated on or about September 21, 2018.

### **_Leo DICKERSON's Possession of a Firearm on May 20, 2019_**

9.      On May 20, 2019, at 12:51 a.m., Kent Police Department officers responded to a shooting at the Apex Apartments, 25011 46th Avenue South, in Kent, Washington.  The shooting victim, DT, was lying on the ground covered in blood and had gunshot wounds to both his legs.  DT was transported to Harborview Medical Center for medical treatment of a life-threatening arterial injury.

10.    At the scene, officers located 10 spent cartridge casings of 9mm caliber, which they collected and entered into evidence.

11.    The suspect fled from the scene in what witnesses described as a red Dodge Charger with distinct large rims.  Neighbors who witnessed the incident described the suspect as a male wearing a grey hooded sweatshirt and grey sweatpants.

12.    Kent Police Detective Melanie Robinson was assigned this case as lead investigator.  Her investigation revealed that DT had just left a woman's apartment when he was shot.  The woman, KW, has been in a dating relationship with DT, and had also been involved in a relationship with a man named Hamead ABDULLAHI.  KW denied that she was romantically involved with ABDULLAHI, but admitted that ABDULLAHI was interested in a romantic relationship with her and that she allowed him to give her gifts.

13.    KW said that she asked DT what happened after he was shot, and DT said something to the effect of "It was your boyfriend."  In a 911 call immediately after the incident, the following statements were recorded:

> DT:   I've been shot, I need help now.  Need help now.  Need help now.  I'm in Kent. I don't know.  I'm outside.  Help me.
>
> KW:   Oh my God what happened.
>
> DT:   Your f---ing boy did it.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

KW:   Where are you hit? Oh my God, I love you [DT], I'm so sorry.
Where are you hit babe?  I am so sorry, I love you so much.
He's hit, somebody shot him.  I don't know what happened.  I
just heard the shots and left my house.  Was it him babe?  Was
it him?  I think it was Hamead.

14.    One neighbor, MM, said he heard gunshots and saw a red "Malibu or
Dodge" vehicle with its headlights off, backed in close to the mailboxes at the base of the
hill near the entrance to the Apex Apartment complex.

15.    Another neighbor, BW, also saw a car parked near the mailboxes at the
time of the shooting.  He saw a subject get into the passenger side of the car, and the
subject yelled, "Let's go, let's go."

16.    A third neighbor, ES, looked out his window after he heard gunshots.  He
saw a male walking eastbound to a rock wall where he jumped over to the street below
(46th Avenue South).  Due to the level of the road, ES lost sight of the male momentarily
and then saw a red Dodge Charger leave the area, northbound, with its headlights off.

17.    Based on information provided by KW and database searches, Kent Police
learned that ABDULLAHI was the registered owner of a red 2006 Dodge Charger
bearing license plate SU00234, registered at an address in Seattle.  Seattle Police were
advised of the shooting and asked to look for ABDULLAHI's red Dodge Charger at the
vehicle's registered address.

**Vehicle Stop of DORSEY, DICKERSON, and ABDULLAHI**

18.    At 2:48 a.m. on May 20, 2019, approximately two hours after the shooting,
Seattle Police stopped ABDULLAHI's red Dodge Charger near his residence in Seattle.
The driver was Devaughn DORSEY.  Hamead ABDULLAHI was sitting in the front
passenger seat.  Leo DICKERSON was sitting in the rear passenger seat on the right side.

19.    At the time of this incident, ABDULLAHI, DICKERSON, and DORSEY
each had a federal felony conviction for a firearm-related offense, and each was on
federal supervised release.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

20.     Kent Police Detectives Galetti and Steffes responded to the scene and interviewed DORSEY.  After being advised of his *Miranda* rights, DORSEY told detectives that that he was picked up by his friends, whose names he refused to provide, at some "restaurant" in Burien.  He did not give a specific time but stated he and his friends were only together for a maximum of two hours prior to being pulled over by Seattle Police.  He said his friend had been driving the Charger but that he began driving because he had a license and the others had been drinking.

21.     DORSEY said at some point they drove to the QFC on Capitol Hill to pick up a bottle of Courvoisier liquor.  He said that he was not in Kent today and had no idea why police pulled them over.  DORSEY said there was no suspicious conversation in the vehicle and all they were doing was driving around "looking for females."

22.     Detectives also advised DICKERSON of his *Miranda* rights and interviewed him at the scene.  DICKERSON told detectives that DORSEY was his friend and the two had been hanging out together at DORSEY's girlfriend's house in Burien since Friday (May 17, 2019).  DICKERSON said that ABDULLAHI came to the Burien house around 1:00 a.m.  DICKERSON claimed that he had not met ABDULLAHI before this evening.  DICKERSON said DORSEY came to him and said, "Come on bro, I'm trying to leave."  Since the two had been in the Burien house since Friday, DICKERSON welcomed the opportunity to leave the residence and "get some fresh air."

23.     DICKERSON stated that he got in the backseat of ABDULLAHI's Dodge Charger.  He said that ABDULLAHI was driving and DORSEY was sitting in the front passenger seat.  DICKERSON claimed that he did not know where they were going or what they were doing.  He said that DORSEY took over driving because he had a valid license and ABDULLAHI did not.

**Firearms Recovered from the Vehicle**

24.     Detectives served a search warrant on ABDULLAHI's Dodge Charger and located a black backpack in the backseat, next to where DICKERSON had been sitting:

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



25.     The backpack contained three firearms:

- One Glock 22 .40 caliber pistol;

- One Springfield XD 9mm caliber pistol; and

- One Walther PPQ 9mm caliber pistol.

26.     The firearms were analyzed for latent prints, and no prints of comparison value were recovered.

27.     The firearms were analyzed for DNA by the Washington State Patrol Crime Laboratory.  A DNA profile extracted from the Glock 22 .40 caliber pistol was a match to a DNA profile of Leo DICKERSON.[1]  DORSEY and ABDULLAHI were excluded as contributors to the DNA profile.  The DNA samples from the Springfield XD 9mm

---

[1] Specifically, the Washington State Patrol Crime Laboratory report stated:  "Assuming four contributors, it is 640 octillion times more likely to observe this DNA profile if it originated from Leo Dickerson and three unknown contributors rather than four unrelated individuals selected at random from the U.S. population."

COMPLAINT / LEO DICKERSON - 7

1  caliber pistol and the Walther PPQ 9mm caliber pistol each contained a complex DNA

2  profile originating from at least five individuals, and neither of these profiles was suitable

3  for comparison.

4        28.     Spent cartridge casings from the shooting at the Apex Apartments were

5  compared to spent cartridge casings from a test-firing of the Walther PPQ 9mm caliber

6  pistol, using the National Integrated Ballistic Information Network (NIBIN).[2]  Through

7  this comparison, a trained Washington State Patrol Crime Lab Firearms Unit examiner

8  sent a preliminary lead notification indicating that the unique markings on the spent 9mm

9  caliber cartridge casings from the Apex Apartments were consistent with the spent

10  cartridge casings fired from the Walther PPQ 9mm caliber pistol recovered from

11  ABDULLAHI's car.

12        29.     On July 19, 2019, United States District Judge Robert S. Lasnik sentenced

13  DICKERSON to 9 months in custody for violating supervised release by associating with

14  DORSEY.  On August 1, 2019, United States District Judge James L. Robart sentenced

15  DORSEY to 9 months in custody for violating supervised release by associating with

16  DICKERSON.

---

21    [2] Through training, research, and experience, I am aware that when a gun is made, the manufacturing
equipment etches microscopic markings onto the gun's metal parts. These markings, called tool marks, are
22  transferred to a bullet or cartridge case when the gun is fired.  These unique marks allow forensic firearm examiners
to determine, among other things, whether a particular fired cartridge case was fired from a specific gun or whether
23  different fired cartridge cases were fired from the same gun.

24    I am also aware that ATF maintains a database of digital images of spent bullets and cartridge cases that
were found at crime scenes or test-fired from confiscated weapons. This database is called the National Integrated
25  Ballistics Information Network (NIBIN). ATF manages the system and provides the equipment to crime labs around
the country.  An entry technician uses ballistic imaging to convert the spent rounds into two- or three-dimensional
26  digital images that are uploaded into NIBIN. NIBIN can be searched for possible matches — that is, other rounds
that have similar tool marks and thus may have been fired from the same gun. After a possible match, or "hit" is
27  identified, the Washington State Patrol Crime Lab Firearms Unit sends a presumptive investigative lead notification
to the case investigators.  This lead can later be confirmed by microscopic comparison by a forensic firearms
28  examiner.

30.     DICKERSON finished serving his supervised release sentence on **February 20, 2020**; however, the Bureau of Prisons permitted him to serve a portion of his sentence on home confinement.

### ***Leo DICKERSON'S Possession of a Firearm on February 14, 2020***

31.     On February 14, 2020, members of the South Sound Gang Task Force (SSGTF) and Washington State Department of Corrections (DOC) conducted an arrest and search warrant execution at 3939 10th Street SE, Apartment E3, Puyallup, Washington. The apartment was the residence of Deshawn WEST, a multi-convicted felon and a documented gang member. WEST was being arrested by the DOC for violating conditions of release. SSGTF had a Pierce County Superior Court search warrant for the residence to locate firearms and related evidence.

32.     At approximately 3:45 p.m., a gray-colored Honda sedan bearing Washington license plate, BSM 7108, pulled in front WEST's residence. Agents observed three males in the vehicle: an unknown middle-aged male driver with a light complexion; Deshawn WEST, who was riding in the rear passenger seat; and another black male passenger, later identified as Leo DICKERSON.

33.     WEST and DICKERSON exited the vehicle in front of WEST's apartment, E3. The vehicle drove to the south of the parking lot and eventually exited the lot. WEST appeared to have a plastic bottle containing liquid in his hand. DICKERSON exited the vehicle carrying a black bag by the straps.  The bag appeared to have something of significant weight inside. WEST and DICKERSON walked up the stairs and lingered on the front porch until someone opened the door. The front door opened and both WEST and DICKERSON entered the residence.

34.     A short time later, WEST stepped out of his front door onto the porch shared with neighboring apartment. WEST quickly stepped inside his apartment and closed the front door after seeing his assigned DOC Officer approaching. After several seconds, WEST re-emerged from the front door, walked down the exterior stairs, and was taken into custody without incident.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

35.     After WEST was arrested by DOC, other occupants were called out of the apartment: DICKERSON, an adult female who was identified as Tekeyta Hyland, and a juvenile female who was identified as WEST's daughter.

36.     DICKERSON was advised he was not under arrest, and after agreeing to be interviewed, he provided the following information:

- DICKERSON stated he had been friend with Deshawn WEST for many years and they were "like family."

- DICKERSON was on federal supervised release after recently being released from federal prison on a firearm charge, and he and WEST had been hanging out a lot.

- DICKERSON lived in Kent somewhere, but could not remember the address because he had just moved into the residence.

- DICKERSON stated he received special permission from his probation officer to hang out with WEST, whom he knew to have felony convictions, because the two were basically family.

- DICKERSON had not observed WEST with any firearms, narcotics, or other illegal contraband.

- DICKERSON had been in WEST's apartment many times recently, and had never observed any firearms, narcotics, or other illegal contraband.

- DICKERSON stated he had not possessed any firearms, narcotics, or other illegal contraband since being released from prison.

37.     DICKERSON was released on scene and departed in a black Honda CRV, bearing Washington license plate, AUX9021, which was driven by Amber Marie JACKSON. Prior to DICKERSON entering the vehicle, JACKSON consented to a search by law enforcement. No illegal contraband was observed.

38.     As noted above, at the time of this incident, DICKERSON was still serving his sentence for the prior supervised release violation, on home confinement.  According

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  to Bureau of Prisons records, he finished serving that sentence on February 20, 2020,

2  approximately one week after this incident.

3      39.    Further investigation determined that DICKERSON had not been

4  authorized to associate with WEST or leave his approved residence to stay at WEST's

5  apartment in Puyallup.

6  **Search Warrant of WEST's residence**

7      40.    After WEST's arrest, SSGTF executed a search warrant of his residence.

8  Seized from WEST's apartment pursuant to the warrant were the following items.

9      41.    Investigators located a black MCM backpack on the floor next to a couch,

10  between the kitchen and the living room.  Inside the backpack, they located a Smith &

11  Wesson SD40, .40 caliber pistol, loaded with one round in the chamber and 11 rounds in

12  the appropriately seized and inserted magazine. Additionally, white pants, size 46x30,

13  and a red shirt, size multiple XL, were located in the main compartment of the black

14  MCM backpack.

15      42.    A loaded Glock 20, 10mm caliber pistol was located in the laundry room

16  and appeared to have been hidden in a corner next to the dryer, behind a stack of multiple

17  items.[3]

18      43.    A black extended Glock, .40 caliber magazine was located inside a drawer

19  in WEST'S bedroom, and a box containing 28 rounds of .40 caliber ammunition was

20  located inside a desk in the living room.

21      44.    As described above, when DICKERSON arrived at WEST's apartment

22  shortly before the search warrant was executed, investigators observed DICKERSON

23  carrying a black bag by the straps which appeared to have something of significant

24  weight inside it.

25

26

27

28  [3] WEST has been charged by Complaint with unlawfully possessing this Glock 10mm caliber firearm on February 14, 2020, and with unlawfully possessing a different firearm in September and October 2019.  *See United States v. Deshawn West*, MJ20-5073-TLF.

COMPLAINT / LEO DICKERSON - 11

1    45.    The large sizes of the pants and shirt recovered in the black backpack along

2    with the Smith & Wesson pistol are consistent with the sizes that DICKERSON would

3    wear and not consistent with the sizes WEST would wear.  DICKERSON is listed by

4    Washington Department of Licensing as 5'05" tall and 300 pounds. Additionally,

5    DICKERSON's criminal history record lists him as 5'02" tall and 300 pounds.  In

6    contrast, WEST is listed in his criminal history records as 5'9" tall and 160 pounds.

7                            ***Interstate Nexus Examinations***

8    46.    ATF Special Agent David Roberts reviewed photographs of the Glock 22,

9    .40 caliber pistol, the Springfield XD, 9mm caliber pistol; and the Walther PPQ, 9mm

10   caliber pistol recovered from ABDULLAHI's vehicle on May 20, 2019.  SA Roberts has

11   additional training and is considered an expert in determining the location of a firearm's

12   manufacture.  SA Roberts determined that none of the three firearms was manufactured

13   in the State of Washington.  Therefore, each firearm must have traveled in interstate

14   commerce in order to arrive in the State of Washington.

15   47.    ATF Special Agent Brian Arnold reviewed photographs of the Smith &

16   Wesson SD40, .40 caliber pistol and Glock 20, 10mm caliber pistol recovered from

17   WEST's residence on February 14, 2020.  SA Arnold has additional training and is

18   considered an expert in determining the location of a firearm's manufacture.  SA Arnold

19   determined that neither of the aforementioned firearms was manufactured in the State of

20   Washington.  Therefore, each firearm must have traveled in interstate commerce in order

21   to arrive in the State of Washington.

22   //

23   //

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## CONCLUSION

2    48.    Based on the foregoing, I respectfully submit that there is probable cause to

3 believe that DICKERSON, committed the foregoing offenses of Felon in Possession of a

4 Firearm, in violation of Title 18, United States Code, Sections 922(g)(1).

5

Digitally signed by ANDRIY
VAVILIN
Date: 2020.05.17 17:58:14
-07'00'

6

7    ANDRIY VAVILIN, AFFIANT

8    Special Agent, ATF

9

10    The above-named agent provided a sworn statement attesting to the truth of the

contents of the forgoing affidavit on the 18th day of May 2020.  The Court hereby finds

11 that there is probable cause to believe the defendant committed the offense set forth in the

12 Complaint.

13

14

15    HON. MARY ALICE THEILER

16    United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970